*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-1438

GARY FRYE, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(DVM-927-12)

(Hon. Stuart G. Nash, Trial Judge)

(Argued November 20, 2013     Decided March 13, 2014)

*Andrew Murnane* for appellant.

*Demian S. Ahn*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman* and *Chrisellen R. Kolb*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and FARRELL, *Senior Judge*.

Opinion for the court by *Senior Judge* FARRELL.

Dissenting opinion by *Associate Judge* EASTERLY at page 16.

FARRELL, *Senior Judge*: Following a bench trial, appellant was found guilty of simple assault on Jewel Parker. He contends on appeal that Ms. Parker's

statements in answer to the lone question "what happened" by a police officer responding to a report of an assault were admitted in evidence in violation of his constitutional right to confront Parker, who did not testify at trial. Agreeing with the trial judge that the statements were not "testimonial" in the circumstances, hence were not reached by the Sixth Amendment, we affirm.[1]

**I.**

Two Metropolitan Police officers arrived at a house on Texas Avenue, S.E., minutes after receiving an emergency telephone call from a child for an assault in progress there, apparently involving the child's parents. They were let into the house by a child, and upon entering, one officer, James Phillips, saw five children downstairs as well as a man and a woman – appellant and Parker – "arguing at the top of the stairs," a foot apart. Appellant "was pacing back and forth" with "his fist clenched up," while Parker was "backing away a little" and appeared nervous as the couple shouted at each other.

---

[1] Appellant does not dispute that, as a common law evidentiary matter, the statements were admissible as excited utterances.

The officers walked upstairs and started moving the pair to separate bedrooms. As Phillips began talking with Parker in one room, the other officer, Makanoff, "was proceeding to another room" with appellant, although Parker and appellant were still "close," separated by "between five and ten feet." Phillips asked Parker "what happened," and Parker explained – without further questioning – that the couple had begun arguing over appellant's use of PCP, that when she locked herself in a room where she felt safe appellant "kicked the door in," and that he grabbed her by the arms, "slammed her on the floor," and "held her down by the arms and choked her." Parker showed Phillips how appellant "choked her by putting his two thumbs to the crevice of, the middle of her throat." She had "tried to defend herself by scratching him," but "lost consciousness."

Parker's narration of the events took under two minutes, throughout which she was "shaking . . . and . . . crying." She had abrasions on her arms and neck, and to Phillips she appeared in need of medical attention. Appellant, meanwhile, was questioned in a room five to ten feet away (the children remained downstairs), and as Officer Makanoff spoke with him, appellant was "profusely sweating," "speaking loudly," and had his "fists balled up."

Phillips testified that "the sum total of [his] knowledge when [he] arrived at the scene was that an assault was alleged to have occurred" there. He had no "information as to the number of people that were involved in the . . . argument," "who was the perpetrator of the assault," and whether weapons had been involved. Specifically, he had no "reason to believe one way or the other that there were . . . weapons involved or . . . no weapons involved," but said that when he went "to any scene where there's an assault in progress," he took "into consideration that weapons might be involved." Phillips' "primary intent in responding that night . . . was to figure out if a crime had occurred, what happened, and if someone needed to be placed under arrest."

Officer Makanoff, who questioned appellant separately, likewise testified that when he and Phillips arrived at the house "they didn't know what had occurred," and as he began questioning appellant, he told him "we don't know why we're here yet."

## II.

Based on this record evidence and reasonable inferences therefrom, the trial

judge concluded that Parker's answers to the lone question "what happened," posed by Phillips in trying to assess the volatile situation the police met on entering the house, were not testimonial. The trial judge focused on "the relative lack of information [the police] had when they arrived on the scene as to what was going on." Phillips had recalled only that "a child . . . called 911 and said that his parents were fighting." While it was a "reasonable assumption" that the man and woman at the top of the stairs "had been involved in the fight," even that fact "wasn't clear to" the officers such that, by separating the pair, they knew they "had succeeded in defusing the situation." Instead, in trying "to figure out what was going on, to see what they needed to do to address the situation," the officers sought to learn whether they had "to send for . . . medical assistance, whether they needed to secure a weapon to ensure the safety of the children, whether the . . . person who was with . . . Makanoff . . . was, in fact, the person who had assaulted Ms. Parker, or whether there was someone else running around the house that needed to be secured." In short, "[t]here was a wealth of things that they didn't know," and thus it was "plain" to the judge "that the officers' purpose in asking [what happened] . . . had to have been to figure out . . . their appropriate response [to] an explosive situation . . . still occurring when [they] arrived at the scene . . . ." For similar reasons, the judge concluded that Parker "did not have in her mind that

she was providing a statement to the officers that could be used at some subsequent criminal prosecution of [appellant]."

## III.

## A.

In a context such as this where police have responded to an emergency telephone call for help, a victim's answers to police questioning are "testimonial," and thus reached by the Confrontation Clause, if they have been "procured with a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant*, 131 S. Ct. 1143, 1155 (2011). More specifically, they are testimonial if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). Conversely, if the purpose of questioning is "not to create a record for trial," *Bryant*, 131 S. Ct. at 1155, but "to enable police assistance to meet an ongoing emergency," *Davis*, 547 U.S. at 822, a resulting answer is not testimonial and its admissibility, instead, "is the concern of state and federal rules of evidence." *Bryant*, 131 S. Ct. at 1155. "[T]here may be *other*

circumstances, aside from ongoing emergencies, where a statement is not procured" primarily to create the equivalent of testimony, but the existence of such an emergency "is among the most important circumstances" to be considered in making that determination. *Id*. at 1155, 1162 (emphasis in original).

Further, in carrying out the primary purpose inquiry, a court "objectively evaluate[s] the circumstances in which the encounter occurs and the statements and actions of the parties," *id.* at 1156; "the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id*. at 1160. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry," *id*. at 1158, and "must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight." *Id*. at 1157 n.8. As the proponent offering Parker's statements as evidence, the government "bears the burden of demonstrating [their] admissibility." *Best v. United States*, 66 A.3d 1013, 1017 (D.C. 2013).

**B.**

Here, upon entering the Texas Avenue home, the police found themselves

witnessing a heated argument between two adults. The officers faced what the trial judge correctly saw as a situation "fluid and somewhat confused," *Bryant*, 131 S. Ct. at 1166, one they had to "assess" quickly "to know whom they [were] dealing with," the "threat to their own safety, and possible danger to the potential victim" or others, in this case five children also in the house. *Davis*, 547 U.S. at 832. "Such exigencies," the Supreme Court said in *Davis*, "may often mean that 'initial inquiries' produce nontestimonial statements." *Id*. (italics omitted). That, in our view, is what Officer Phillips' single question to Jewel Parker produced.[2]

Appellant and our dissenting colleague argue to the contrary by emphasizing that appellant and Parker had been "actively separated" before she was questioned, *id*. at 830, likening the situation to that in *Hammon v. Indiana* (consolidated with *Davis* by the Supreme Court), where the statements subsequently made by the victim were held to be testimonial. With the separation of the parties, however, the similarity between this case and *Hammon* largely ends. There, upon entering the

---

[2] Thus, our dissenting colleague notwithstanding, "the need of the police to reassure themselves that no emergency existed," *post* at 29, is a key reason – though not the only one – why their question to Parker did not produce a testimonial answer. The dissent's suggestion, *post* at 31 n.12, that almost immediately on entering, the police had sized up the situation as "a fairly straightforward domestic violence scenario" makes a positive virtue of hindsight.

house the police saw "no emergency in progress" and "no immediate threat to [the victim's] person" (she was on the porch and the defendant was in the kitchen), as she told them that "nothing was the matter" and "things were fine." *Id*. at 819, 829-30. She was then questioned twice by the police and both times "deliberately recounted" the assault "some time after the events described were over." *Id*. at 830. Her narrative, besides being "delivered at some remove in time from the danger described," was then reduced to a handwritten affidavit which the police "had her execute . . . in order, [the officer] testified, '[t]o establish events that have occurred previously.'" *Id*. at 832. At trial the affidavit was authenticated and admitted into evidence. *Id*. at 820. In these circumstances, the Court said, the victim's statements at the scene were "an obvious substitute for live testimony at trial." *Id*. at 830.

Parker's situation, as both "a reasonable victim in [her] circumstances," *Bryant*, 131 S. Ct. at 1161, and a reasonable police officer would perceive it, was very different. Her heated dispute with appellant was still "in progress" when the police entered. Although the police separated them before speaking with either (in the sense, at least, that Parker was in one room while appellant, five to ten feet away, "was . . . being brought to another room"), Parker remained visibly

traumatized, "shaking and crying" during her brief exchange with Phillips. Further, where the testifying officer in *Hammon* "expressly acknowledged" that "the interrogation was part of an investigation into possibly criminal past conduct," *id*. at 829, the officers here pointed to a situation "fluid and . . . confused," *Bryant*, *supra*, one "still explosive" when they entered (in the trial judge's phrase) and about which they knew almost nothing, including whether any danger had abated because apparently only two persons and no weapons were involved. Of special concern, four or more children were in the house, a fact that reasonably would have caused officers to consider whether, even in a strictly domestic altercation (with indications of possible PCP use by one antagonist), the children's interest required summoning assistance from a social services agency.[3] Objectively viewed, therefore, Phillips' single question was intended not primarily "to learn . . . what had happened in the past," *Davis*, 547 U.S. at 827, but to clarify what exigencies, if any, existed requiring immediate action. And Parker's shaken demeanor – combined with appellant's continued proximity – reasonably implied that she still felt herself and the children at risk from the violence she had escaped

---

[3] Whether that concern actually motivated Phillips' question is immaterial; "the relevant inquiry is not the subjective or actual purpose of the individuals involved . . . but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 131 S. Ct. at 1156.

moments before. In fact, when appellant was led from the house soon afterwards, he still was not completely subdued as he kicked luggage and other items on the way out.

## C.

The Supreme Court's post-*Davis* opinion in *Bryant* provides helpful markers for determining whether Parker's statements were made primarily for an evidentiary purpose or rather to help the police "assess the situation" and the "possible danger" it still posed to those present. *Davis*, 547 U.S. at 832. First, "[i]n making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Bryant*, 131 S. Ct. at 1155. Indeed, the "logic" of one such rule, "that justifying the excited utterance exception in hearsay law," is "not unlike" that governing the primary purpose inquiry. *Id*. at 1157. Here, Parker's acute emotional distress, which made her answers undisputed "excited utterances," note 1, *supra*, implied that her attention was focused more on "end[ing] a threatening situation" than on "prov[ing] past events." *Id*. (quoting *Davis*, 547 U.S. at 822, 832). To this the dissent replies that any "concern" Parker had with appellant's violence "did not

generate a *reasonable* fear for her immediate safety or [that] of her children." *Post* at 32 (emphasis added). But how it can say that escapes us, since the point *Bryant* makes here is that "reasonable[ness]" must be assessed from the emotion-laden viewpoint of the declarant, not of a composed, after-the-fact observer – here a declarant who believed (reasonably) that appellant had tried to kill or badly hurt her shortly before and still threatened her, his fists angrily clenched, before they were separated.

Further, as in *Bryant*, Parker's distraught condition and injuries from near-asphyxiation, requiring medical treatment, were evidence that she "want[ed] the threat to her and other potential victims," the children, "to end" and "the attacker . . . incapacitated," rather than mainly "want[ing] or envision[ing] prosecution of the assailant." *Id*. at 1161.[4] And, too, as in *Bryant*, the "fluid[,] . . . somewhat confused" situation the police faced and Phillips' resulting "[un]structured interrogation" – consisting of the single threshold question "what happened" – reveal that "the circumstances lacked any formality that would have alerted

---

[4] The dissent understandably does not assert that Parker suffered only "minor injuries and emotional upset," as "seen in innumerable criminal cases," *post* at 39, but yet views her trauma as proof of no more immediate a concern on her part than to enable prosecution of appellant.

[Parker] to or focused [her] on the possible future prosecutorial use of [her] statements." *Id*. at 1166.

Finally, the Court in *Bryant* cautioned "that the existence *vel non* of an ongoing emergency is [not] dispositive of the testimonial inquiry. As *Davis* made clear, whether an ongoing emergency exists is simply one factor – albeit an important one – that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id*. at 1160. That caution, we think, cannot be reconciled with our colleague's effectively limiting the circumstances that justify a conclusion of nontestimonial purpose to the *extreme* exigency of an assault "actually happening" and statements made "to the 911 operator," *post* at 27-28, or "a man bleeding out in the street" and "an unidentified shooter on the loose." *Post* at 39.

## D.

What *Bryant* and *Davis* tell us, in sum, is that in the immediate wake of a violent assault, Parker's emotional re-enactment and implicit appeal for safety – hers and the children's – should not be mistaken for a primary purpose on her part to establish facts relevant to an eventual prosecution. Parker was not the bystander

witness the dissent in effect posits, "report[ing] criminal activity to the police." *Post* at 40.[5] And the officers themselves, though potential arrest was certainly on their mind, were focused on clarifying and ensuring control of the still volatile situation they had interrupted moments before. "Mixed motives," as the Court implied in *Bryant*, 131 S. Ct. at 1161, are almost inevitable in the first stages of police response to an emergency call, because "[p]olice officers in our society function as both first responders and criminal investigators." *Id*.; *see id*. (quoting *Davis*, 547 U.S. at 839) (Thomas, J., concurring in part and dissenting in part) ("[T]he purposes of an interrogation, viewed from the perspective of the police, are

---

[5] The dissent repeatedly cites to Officer Phillips' *Gerstein* affidavit prepared to support appellant's arrest, but as memorialized in that document, Parker's statements were as much expressions of concern about appellant's PCP relapse and its effect on his behavior and the family as they were (in our colleague's words) an explanation of how "criminal past events began and progressed." Parker told Phillips that she confronted appellant about "a drug problem he's been having"; that he "had used PCP a lot in the past" but had "stopped for a couple of years and started using it again recently," such that if Phillips were to "piss him right now, he will have PCP in his system"; and that appellant had "snapped" when "she told him he needed to take care of his drug problem." Only then did Parker state, more briefly, that appellant had "kicked the bedroom door in" and slammed her to the floor and begun choking her. This account does not reveal, any more than Phillips' summary of it at trial, that Parker's primary purpose was to aid the police in investigating a crime; rather, her excited report of appellant's PCP relapse as the reason for the violence suggests that she was motivated by concern for the family's and his own well-being, wanting "the attacker to be incapacitated temporarily or rehabilitated," *Bryant*, 131 S. Ct. at 1161, not prosecuted.

*both* to respond to the emergency situation *and* to gather evidence" (emphasis in original)). Although these "dual responsibilities may mean that [police] act with different motives simultaneously or in quick succession," *id*., the circumstances facing the police here, as first responders, convince us that their intent had not changed primarily to gathering evidence for possible prosecution – to "creating an out-of-court substitute for trial testimony," *id*. at 1155 – when they entered and first sought to learn from Parker, in Makanoff's words, "why we're here." Merely separating appellant from Parker, in other words, did not result in the "controlled environment" our colleague hypothesizes, *post* at 21, until the police had assessed the turmoil and still threatening situation they met on entering and any danger it posed to those present, including children.

**E.**

From all this it should be clear that our holding is far from a "determination that all initial statements to police acting as first-responders should be exempt from confrontation." *Post* at 39 n.17. Generalizing in that fashion would be as invalid as, for instance, using hindsight to cast a fluid, still volatile situation in the mold of a police-"controlled" setting and a "structured" interview, or to impute to police

officers, as soon as they arrive on the scene, the ability to spot "a fairly straightforward domestic violence scenario," *post* at 31 n.12, with no unknowns potentially threatening to themselves or others. Our holding derives instead, as it must, from "a highly context-dependent inquiry" into the facts of this case, *Bryant*, 131 S. Ct. at 1158, viewed objectively from the perspective of both the officers and the victim-declarant. That does not spare us, of course, from the dissent's charge that we have engaged in analysis "reminiscent of the subjective reliability determinations" since rejected by the Supreme Court, *post* at 36 (citing *Ohio v. Roberts*, 448 U.S. 56 (1980)); but that charge, it is enough to note, is essentially the same one leveled against the *Bryant* Court's opinion – by Justice Scalia in dissent. *See* 131 S. Ct. at 1175.

We therefore agree with the trial court that the government met its burden of showing that Parker's statements were not testimonial.

*Affirmed*.

EASTERLY, *Associate Judge*, dissenting: When the police arrived at the Frye-Parker house in response to a 911 call from a child about parents fighting,

they immediately took control. In a coordinated effort, they took the parents, Mr. Frye and Ms. Parker, into separate rooms and questioned each of them to find out whether a crime had occurred and, if so, who should be arrested. Whether the police acted appropriately is not questioned. Rather, the only issue before us concerns the government's trial court obligations under the Sixth Amendment's Confrontation Clause: If the government wanted to present inculpating evidence from Ms. Parker at trial, was it obligated to bring her to court and call her to the stand to testify, under oath and subject to cross-examination by the defense? Or, could the government rely on a professional witness, the police officer who interviewed Ms. Parker, to take the stand and repeat the out-of-court accusatory statements the officer obtained from Ms. Parker, thereby shielding her from an in-court appearance and adversarial testing? On the record before this court, I think the former scenario is compelled by the Constitution and that reversal of Mr. Frye's conviction is thus required.

Beyond the disposition of this case, I have broader concerns. To reach its conclusion that the government had no obligation to bring Ms. Parker to court, the majority opinion holds that her statements to the police were made in response to an "ongoing emergency." But this holding unduly expands both the concept of

what constitutes an "emergency" and the role of judges in making that determination. Based on the evidence developed at trial, it is apparent that, from the moment they walked through the door, the police considered themselves to be engaged in a routine investigation of a report of domestic violence; Ms. Parker of course did not testify, but nothing in this record indicates that when she spoke to the police she wanted to do anything other than report criminal activity. Venturing beyond this record evidence, however, the majority opinion's analysis turns on the projected "nontestimonial" motivations of the police (a desire to identify any unknown exigencies) and of Ms. Parker (an "implicit" plea for safety for herself and her children)—motivations which, because they have no evidentiary foundation, could be attributed to almost any initial interview between a first responder and a crime victim. This is at odds with the Supreme Court's refusal in *Davis v. Washington,* 547 U.S. 813, 832 (2006), to hold that "virtually any 'initial inquiries' at the crime scene" are nontestimonial. Moreover, by effectively holding that, in the absence of any supporting record evidence, judges can simply impute motivations to the police and the witnesses they interview and thereby control the outcome of any testimonial inquiry, the majority opinion eases the procedural demands of the Confrontation Clause in a way the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 61 (2004), reminded us that we, as judges, are not

permitted to do.

The right of a defendant to confront the "witnesses against him," U.S. Const. amend. VI, is a trial right and "a procedural . . . guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61. The Confrontation Clause "thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined." *Id*. The government's obligation to bring witnesses to court so as to fulfill the right to confrontation guaranteed by the Sixth Amendment is triggered by testimonial statements. Introducing the designation of "testimonial" in *Crawford*, the Supreme Court explained that "[s]tatements taken by police officers in the course of interrogations"[1] are quintessential testimonial statements. 541 U.S. at 52. The Court subsequently reaffirmed in *Davis* that statements to police officers are testimonial when the circumstances "objectively indicate" that "the primary purpose of the interrogation [that produced the

---

[1] The Supreme Court in *Crawford* noted that it was "us[ing] the term 'interrogation' in its colloquial, rather than any technical legal, sense," and thus indicated it was referring to a broad swath of police inquiries. 541 U.S. at 53 n.4.

statement] is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822. This primary purpose is discerned according to a "reasonable participant" standard and is "ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Michigan v. Bryant*, 131 S. Ct. 1143, 1156 (2011) (acknowledging that although there may be mixed motives, the primary purpose controls the testimonial inquiry).

By this measure, the accusatory statements the police elicited from Ms. Parker are testimonial; indeed, they cannot be materially distinguished from those deemed testimonial in *Hammon v. Indiana*, the companion case to *Davis*. *See Davis*, 547 U.S. at 830 (holding that Ms. Hammon's statements were testimonial where they were the product of an "interrogation . . . conducted in a separate room, away from her husband . . . with the officer receiving her replies for use in his 'investigat[ion]'").

The police were dispatched to the Frye-Parker home to investigate a radio run for "an assault in progress" based on a report of parents fighting. *See Davis*, 547 U.S. at 819 (police responded to a "reported domestic disturbance" at the Hammon home). The police "immediately" took charge, separated Ms. Parker and

Mr. Frye, and led them into different bedrooms to be interviewed. *Id.* at 819-20 (the police separately interviewed the Hammons to "investigate what had happened"). Just as in *Hammon*, where the police "expressly acknowledged" that the interrogation that followed "'was part of an investigation into possibly criminal past conduct,'" Majority Opinion at 10 (quoting *Davis*, 547 U.S. at 829), Officer Phillips, the officer who interviewed Ms. Parker, testified that his "primary intent was to figure out if a crime had occurred, what happened, and if someone needed to be placed under arrest."[2]

Only once Officer Phillips had Ms. Parker alone, away from Mr. Frye, in a more controlled environment—more controlled than the situation in *Hammon*[3]—

---

[2] The majority opinion quotes Officer Makanoff, who interviewed Mr. Frye, apparently to suggest that the objective of the police when they interviewed Ms. Parker and Mr. Frye was more open-ended. Majority Opinion at 4, 15. But Officer Makanoff's representation as he began questioning Mr. Frye, "we don't know why we're here yet," is reasonably understood as an effort to encourage Mr. Frye to give his side of the story. And, in fact, Officer Makanoff had received the same information as Officer Phillips from the radio run.

[3] *See Davis*, 547 U.S. at 830 (noting that the police had to "forcibly prevent[] Hershel [Hammon] from participating in [his wife's] interrogation"). The majority opinion notes that Mr. Frye kicked luggage and other items as he was led out of the house, Majority Opinion at 11, but this was after the police completed their investigation and after they placed Mr. Frye under arrest. Any assessment of the reasonable motivations of the police and Ms. Parker must focus on what was known to them at the time her accusatory statement was elicited. At

(continued…)

did Officer Phillips ask Ms. Parker to detail "what happened." And only then did Ms. Parker give the police a detailed statement in which she "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed."[4] *Davis*, 547 U.S. at 830.

Specifically, Ms. Parker told Officer Phillips that she and Mr. Frye had been fighting over his drug use, that the fight "escalated" and became physical, that Mr. Frye kicked down a door to get into the bedroom where she had retreated, and that he slammed her to the floor and choked her until she passed out. This account, including a "re-enactment" of how Mr. Frye had choked her, Majority Opinion at 13, amounted to an accusation of assault, just as in *Hammon*, "some time after the events described were over." [5] Majority Opinion at 9 (quoting *Davis*, 547 U.S. at

---

(…continued)

this point in time, Mr. Frye was "cooperating" with the police. He made "no attempt to fle[e] or anything like that"; he went with Officer Makanoff into a separate room, and he answered Officer Makanoff's questions.

  [4] The majority opinion suggests that Ms. Parker and Mr. Frye were not fully separated at the time she made her statements to the police. Majority Opinion at 3, 9. But this suggestion is not supported by the testimony of the police or the specific findings of the trial court. The trial court found that the police "separated the two individuals at the top of the stairs, brought them [to] separate places, and then Officer Phillips asked Ms. Parker what happened."

  [5] The record does not reflect whether Officer Phillips took notes during his

(continued…)

830).  After all, by the time the police arrived at the Frye-Parker home, they saw Ms. Parker at the top of the stairs, conscious and upright, where she and Mr. Frye were both "yelling" at each other.[6]  Furthermore, beyond accusing Mr. Frye of physical abuse, Ms. Parker also asserted that Mr. Frye had recently used illegal drugs.  (If the order of the events described in Officer Phillips' *Gerstein* Affidavit is correct, Ms. Parker actually did that first, before she turned to the details of Mr. Frye's alleged assault, *see* Majority Opinion at 14 n.5).  Ms. Parker told Officer Phillips, "[i]f you piss him right now, he will have PCP in his system."  The government did not seek to introduce this statement at trial, but the full scope of Ms. Parker's accusations and her reference to the possibility of drug testing Mr. Frye buttresses the testimonial nature of her statements.[7]

---

(…continued)
interview of Ms. Parker, as his colleague, Officer Makanoff, did in his interview of Mr. Frye.  Officer Phillips was, however, able to quote Ms. Parker with precision in his Gerstein Affidavit.  *See* Majority Opinion at 14 n.5.

[6]  The majority opinion states that the alleged assault detailed by Ms. Parker in her statement had taken place "moments before" Officer Phillips interrogated her.  Majority Opinion at 10-11.  The record contains no support for this assertion: Ms. Parker never told the police how much time had elapsed between Mr. Frye's alleged attack and their arrival.  Moreover, there is nothing in the record to indicate how much time elapsed either between the alleged assault and the 911 call or between the 911 call and the broadcast of the radio run to which the officers responded.

[7]  I disagree that an alert to the police that Mr. Frye would fail a drug test can

(continued…)

After Ms. Parker gave this statement to Officer Phillips, he conferred with Officer Makanoff and they pooled the information they had obtained from Ms. Parker and Mr. Frye. They then "determined who the primary aggressor was in the scenario," and placed Mr. Frye under arrest.

Under these circumstances, both from the perspective of a reasonable law enforcement officer and a reasonable interviewee, "the primary, if not indeed the sole, purpose of the interrogation [of Ms. Parker] was to investigate a possible crime." *Davis*, 547 U.S. at 830. And the statements that that interrogation produced, in which Ms. Parker accused Mr. Frye of already completed acts of physical abuse (and drug use), "are an obvious substitute for live testimony . . . [and] inherently testimonial." *Id*.

Nevertheless, the majority opinion holds that the government's

_____

(…continued)
be reasonably interpreted as a desire to get Mr. Frye into treatment, nor do I think a reasonable person in Ms. Parker's situation would have been thinking about rehabilitation when giving a statement about "what happened" to the police. *See* Majority Opinion at 14 n.5.

Confrontation Clause obligations were not triggered by Ms. Parker's accusations because her statements were made with the purpose of "enabl[ing] police assistance to meet an ongoing emergency." Majority Opinion at 6 (quoting *Davis*, 547 U.S. at 822). The majority opinion is correct that statements made with such a "primary" purpose are not testimonial, but this carve-out from the right to confrontation has no application to this case where the government failed to show either that there was an "ongoing emergency" (or at least an objectively substantiated perception of one), or that the actions taken and statements made by the police and Ms. Parker, again, objectively considered, were directed at resolving that emergency.[8]

"[T]he existence of an 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances" to consider "because an emergency focuses the participants on something other than 'prov[ing] past events potentially relevant to later criminal prosecution.'" *Bryant*, 131 S. Ct. at 1157 (quoting *Davis,* 547 U.S. at 822). A court must look to

---

[8] As the majority opinion correctly notes, the government bears the burden to demonstrate the nontestimonial nature of a proffered out of court statement and thus its admissibility. *See Best v. United States*, 66 A.3d 1013, 1017 (D.C. 2013).

what the police and the declarant understood the situation to be at the time the statements were made to assess if an emergency was reasonably perceived. *See id.* at 1157 n.8.

The majority opinion begins its ongoing emergency analysis by noting the state of affairs when the police first entered the Frye-Parker home. Majority Opinion at 9; *see also id*. at 7-8. But this is the wrong point of reference. We must examine the situation at the time Ms. Parker gave her statement to the police. *See Davis*, 547 U.S. at 830 (considering "when the officer questioned Amy [Hammon] . . . and elicited the challenged statements"). At this point, Ms. Parker and Mr. Frye had been taken to separate rooms (an action the police took because they deemed it "the safe thing to do"), the situation had been defused, and Ms. Parker was "protected." *See Davis*, 547 U.S. at 831 (contrasting as nontestimonial "[t]he statements in *Davis* [which] were taken when [Ms.] McCottry was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from [Mr.] Davis"); *Lewis v. United States*, 938 A.2d 771, 782, 780 (D.C. 2007) (statements made to the police after "[t]he exigencies of the initial situation had subsided" and the declarant's alleged assailant had been "detained a safe distance from [the declarant]" were nontestimonial).

Examining this point in time, the record facts do not support the conclusion that Officer Phillips and Ms. Parker perceived an objectively substantiated ongoing emergency.[9] The majority opinion notes Ms. Parker's emotional distress, Majority Opinion at 11, but lest this category of nontestimonial statements reduce to an excited utterance exception,[10] there must be more to it than that. Thus, the Court in *Davis* determined by reference to Ms. McCottry's emotional state that "any reasonable listener would recognize that [she] . . . was facing an ongoing emergency," not only because of her "frantic answers" to the 911 operator, but because these statements were part of a larger mosaic of evidence objectively indicating an ongoing emergency; they "were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." 547 U.S. at 827; *see also id.* (Ms. McCottry "was speaking

---

[9] The majority opinion misunderstands my discussion of *Davis* and *Bryant, infra*, as an effort on my part to use the facts of that case to delimit what constitutes an ongoing emergency. Majority Opinion at 13. The reason why the majority opinion's ongoing emergency analysis fails is because the facts of *this* case simply give no objective indication that an ongoing emergency existed or was perceived by Officer Phillips or Ms. Parker at the time Officer Phillips elicited Ms. Parker's accusatory statement.

[10] *See Crawford*, 541 U.S. at 61 (noting that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence").

about events," her husband beating her up, "as they were actually happening").

The majority opinion alludes to Ms. Parker's injuries. Majority Opinion at 12. These injuries, which were described by the police as bruising and scratches on Ms. Parker's arm and neck, and which the trial court found "certainly not life-threatening," did not impede Ms. Parker from re-engaging with Mr. Frye at the top of the stairs before the police arrived, and they did not prompt the police to immediately call for medical assistance. These injuries cannot reasonably be perceived as grounds to undermine the "ability of [Ms. Parker] to have [a testimonial purpose] . . . in responding to police questions."[11] *Bryant*, 131 S. Ct. at 1159.

Likewise the relative informality of Officer Phillips's interrogation, highlighted by the majority opinion, does not objectively indicate the existence of

---

[11] *Compare Bryant,* 131 S. Ct. at 1150 (nontestimonial statement was made by declarant who was found by the police lying in a gas station parking lot, mortally wounded by a gunshot to the abdomen); *State v. Largo*, 278 P.3d 532, 538 (N.M. 2012) (nontestimonial statement made by declarant where, inter alia, she was "in considerable pain, bleeding from a mortal gunshot wound to the abdomen," lying "on the ground in a pool of her own blood and urine, and at one point was crying out for her mother. Such a severely injured victim suggests that the answers to the questions were merely reflexive.").

an ongoing emergency. Majority Opinion at 12. Ms. Parker's controlled interview with police in her home was, just as in *Hammon,* "formal enough" to produce a testimonial statement. *Davis*, 547 U.S. at 830 ("It was formal enough that Amy [Hammon]'s interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his 'investigat[ion].'").

Ultimately, however, the majority opinion's determination that there was an ongoing emergency at the time Officer Phillips interviewed Ms. Parker turns on a different "key reason." Majority Opinion at 8 n.2. Specifically, the majority opinion stresses the need of the police to learn not just "what had happened in the past," but also "to clarify what exigencies, if any, existed requiring immediate action," Majority Opinion at 10 (quoting *Davis*, 547 U.S. at 827) (internal quotation marks omitted). In other words, the need of the police to reassure themselves that no emergency existed *itself* constituted the "ongoing emergency" that rendered Ms. Parker's statement in response to police questioning nontestimonial.

As a preliminary matter, the majority opinion's focus on potential unknown

exigencies is untethered to the record and grounded only in the speculation of the trial court. In making its ruling, the trial court expressed concern that the police, when they arrived at the Frye-Parker home, did not know whether there was an unsecured weapon. But despite repeated questions by the government framed to elicit support for such a concern, the police admitted that they had "no reason" to believe that there was a weapon involved or present in the house. The trial court expressed concern that there might be "someone else running around the house," but the police never gave any testimony supporting such a concern; indeed, they were never asked about the possibility of another adult in the house. The trial court expressed concern that there might have been some other undefined, unknown threat to the children in the home. But, again, no evidence was presented about any such threat and the fact that the police left the children (all between the ages of 10-14) unattended on a separate floor while they interviewed Ms. Parker and Mr. Frye indicates that the only reasonably perceived threat to the children came from their parents.

The objective standard for assessing what constitutes an ongoing emergency, *see* Majority Opinion at 10 n.3, exists to preclude government witnesses from coming to court after the fact and asserting they were responding to an emergency

when there is no evidence in the record that this is the case. But this objective standard does not give judges license to discern the motivations of government witnesses that have no record foundation. Put more bluntly, it is not for courts to relieve the government of its Confrontation Clause obligations by determining that police officers *should have* perceived an emergency that *would have* focused them on something other than "prov[ing] past events potentially relevant to later criminal prosecution."[12] *Davis*, 547 U.S. at 822.

Beyond a lack of record support, there are at least two problems with relying on what is unknown to the police as the foundation for discerning an "ongoing emergency" in this case. First, there are always unknowns when the police respond to a reported crime scene. Nonetheless, the Supreme Court in *Davis* declined to endorse a categorical "first responder" construction of what constitutes a nontestimonial statement when it "necessarily reject[ed]" the proposition that "virtually any 'initial inquiries' at the crime scene will not be testimonial." *Davis*,

---

[12] Juxtaposed with its reliance on imputed motives, the majority opinion's assessment that the dissent makes "a positive virtue of hindsight," Majority Opinion at 8 n.2, is curious. I simply rely on the record evidence. That evidence establishes that when the police entered the Frye-Parker home, they reasonably assessed this situation as a fairly straightforward domestic violence scenario— where the only objectively discerned unknown was the identity of "the initial aggressor"—and they acted accordingly.

547 U.S. at 832. Nor does the discussion of mixed motives in *Bryant* support the proposition that the police, faced with unknowns, presumptively begin every first response to a report of a crime with a non-investigative motive that must then "change[] primarily to gathering evidence for possible prosecution" in order to trigger the protection of the Confrontation Clause. Majority Opinion at 15. *Bryant* assigns no set progression of motives to the police; it merely acknowledges that the police may "act with different motives simultaneously or in quick succession." *Bryant*, 131 S. Ct. at 1161. And as *Davis* and *Bryant* make clear, whether, at the time a statement is taken from a witness, the police are motivated predominantly to respond to an ongoing emergency "is a highly context-dependent inquiry." 131 S. Ct. at 1158.

Second, what is unknown to the police cannot be synonymous with an "ongoing emergency," because it leaves out the other half of the testimonial equation—that is, how the declarant reasonably perceived the situation. *See Bryant*, 131 S. Ct. at 1160 n.11 (clarifying that the requisite inquiry into the testimonial nature of a statement does not "prescribe[] examination of one participant[, either interrogator or declarant,] to the exclusion of the other"). Although many basic facts may be unknown to the police when they first respond

to the report of a crime, the people they encounter and interview at the scene will likely not share their ignorance. The circumstances here reasonably indicate that Ms. Parker did not fear the majority opinion's unknowns—if she feared anyone, she feared Mr. Frye. But any concern she had about Mr. Frye did not generate a reasonable fear for her immediate safety or the immediate safety of her children at the time she gave her accusatory statements to the police. She was with a police officer in one room, Mr. Frye was with another officer in another room, and her children were on a different floor. The fact that she never articulated any subjective concern for her own immediate well-being or the well-being of her children is an additional indicator that any such fears had passed, and is why the majority opinion is forced to rely on "implied" communications.[13] *See* Majority Opinion at 10-11, 13.

This leads to the second step of the "ongoing emergency" inquiry. As the Supreme Court stressed in *Bryant*, although courts must preliminarily inquire whether a statement was made during an ongoing emergency, "the existence *vel*

---

[13] Among these implied communications we must include the majority opinion's assertion that Ms. Parker "believed (reasonably) that appellant had tried to kill her." Majority Opinion at 12. Ms. Parker never communicated any such belief to the police; rather she reported facts amounting to an alleged assault.

*non* of an ongoing emergency" is not dispositive, 131 S. Ct. at 1160; "rather, the ultimate inquiry is whether the 'primary purpose of the interrogation [was] to enable police assistance to meet [the] ongoing emergency.'"[14] *Id*. at 1165 (quoting *Davis*, 547 U.S. at 822). In other words, the questions and responses must be directed at "resolv[ing] the present emergency." *Davis,* 547 U.S. at 827.

Officer Phillips testified that he only had to ask one question—"what happened?"— to elicit a full narrative from Ms. Parker about Mr. Frye's violent acts. The fact that Officer Phillips stopped his questioning there is compelling evidence that his "primary" interest at that time was to elicit that narrative. Had he in fact been seeking to "clarify what exigencies, if any, existed requiring immediate action," Majority Opinion at 10, one might reasonably have expected him to ask Ms. Parker (when she did not volunteer) whether there were any unsecured weapons in the house, whether there were any other additional assailants

---

[14]    Quoting this passage, the majority opinion seems to interpret it as eschewing the need for any emergency at all. *See* Majority Opinion at 13. To be sure, statements may be nontestimonial for a variety of reasons. But the point the Supreme Court was making is that if, as here, the government argues that a proffered out-of-court statement was made in response to an "ongoing emergency," so as to be nontestimonial, the government must then carry its burden to show both the existence of an emergency and that the statement was directed at resolving that emergency.

in the house, or whether she had any injuries that required immediate medical attention.[15]

Looking to what Ms. Parker said, there is similarly no objective indication that she was seeking to "resolve [a] present emergency." *Davis,* 547 U.S. at 827. Again, she never said that she feared for the immediate safety of herself or her children; moreover, she never asked the police to assist her in leaving the home or to remove Mr. Frye from the home, and she never asked for medical assistance. Instead, she provided a "narrative of past events [that] was delivered at some remove in time from the danger she described," *id*. at 832, and accused Mr. Frye of illegal drug use in addition to assault.

The majority opinion discerns an "implicit appeal for safety" in Ms. Parker's

---

[15]    *Compare Lewis*, 938 A.2d at 774, 781 (where officer approached declarant as she sat in her car because he saw that she had "a large amount of blood on her shirt" and was "bleeding from the head and face area," and the victim volunteered "he was trying to kill me," even before the officer could ask if she needed medical assistance, the subsequent questions posed—"Who was trying to kill you?," "Do you need medical attention?," "What did he do?," "How did you get cut on your head?"—"were not investigatory in nature, but were designed to gather information necessary to respond to the emergency" and "to assess the risk of danger, ensure the safety of the victim and the community, and secure any needed medical treatment.").

statements. Majority Opinion at 13. The majority opinion's divination of an unexpressed "cry for help"—one the trial court apparently did not hear[16]—is reminiscent of the subjective reliability determinations that courts made under *Ohio v. Roberts*, and that the Supreme Court roundly rejected in *Crawford*, 541 U.S. at 67 (declining to leave so "much discretion in judicial hands"). This is not to say that a declarant must use specific words, but at a minimum there must be something in the circumstances or the statement to indicate that the declarant is motivated by some concern about her own or others' well-being. *See, e.g.*, *Lewis*, 938 A.2d at 773-74 (finding declarant's statements nontestimonial where she was "was bleeding from the head and face area," yelling that appellant was trying to kill her, and appellant was walking away); *Long v. United States*, 940 A.2d 87, 97 (D.C. 2007) (finding victim's expressed concern regarding the "gaping wound on his face" reasonably indicated that he was motivated to approach the police "to seek medical treatment" and "to make the police aware of a danger to others"); *Largo,* 278 P.3d at 534, 538 (finding victim's statement that she had been shot by her husband and that he "was headed to the school to shoot the kids" was an "express[ion] [of] fear for her children's safety" and indicated that her "primary concern was not the future prosecution of the assailant").

---

[16] *See* Majority Opinion at 5 (summarizing the trial court's ruling).

Again *Hammon* is illuminating and demonstrates that an "implicit appeal for safety" cannot be extrapolated from this record. Like Ms. Parker, Ms. Hammon appeared "frightened" when the police arrived at her home, *Davis*, 547 U.S. at 819, and the police particularly observed that she "grew quiet" when in the presence of her husband. *Hammon v. State*, 809 N.E.2d 945, 949 (Ind. Ct. App. 2004), *vacated*, 829 N.E.2d 444 (Ind. 2005), *rev'd and remanded*, *Davis*, 547 U.S. 813, 815. Ms. Hammon subsequently told the police that her husband had thrown her down onto broken glass, that he had punched her twice in the chest, and that she was in pain as a result. *Id.* at 948. She also said that he had destroyed other property in the house, damaged her van so she could not leave the house, and attacked her daughter. *Id.*; *see also* 547 U.S. at 820-21. Yet none of this led the Court to discern that Ms. Hammon was making an "implicit appeal for safety" for herself or her daughter, *see* 547 U.S. at 832 (determining that Ms. Hammon's accusatory statements "were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation"), or persuaded the court to alter its assessment that her statements detailing her alleged abuse were testimonial.

Without a statement responsive to an ongoing emergency, indeed, without any ongoing emergency at all, the admission of Ms. Parker's out of court accusations cannot be categorized as nontestimonial under an "ongoing emergency" analysis.

\*          \*          \*

"The text of the Sixth Amendment does not suggest any open-ended exceptions from the confrontation requirement to be developed by the courts," *Crawford*, 541 U.S. at 54.  Although the majority opinion states that "it should be clear" that it is not creating just such an exception for all individuals who speak to police officers acting as first-responders, Majority Opinion at 15, I am not reassured.  I see no limiting principle.  If a court can impute whatever nontestimonial motives it deems warranted without regard for the record evidence, it seems any statement to a first responder can be cleared for admission without confrontation.

I see no support for such an exception in the post-*Crawford* case law,[17] including *Bryant*, which the majority invokes. Majority Opinion at 16. The majority opinion goes well beyond *Bryant*, where the Court was presented with very different facts—a man bleeding out in the street and the police facing a threat to the general public from an unidentified shooter on the loose—not the minor injuries and emotional upset seen in innumerable criminal cases. *See Bryant*, 131 S. Ct. at 1163-64.

Instead, I believe it is clear under our post-*Crawford* precedent that this case

---

[17] Even if we were unconstrained by binding precedent, I see little to be gained and much to lose by endorsing the majority opinion's effective determination that all initial statements to police acting as first-responders should be exempt from confrontation. I fear that the permissiveness of the majority opinion will promote prosecutorial reliance on these out-of-court statements, particularly in domestic violence prosecutions. I fear an incentive structure will arise that rewards getting information quickly and perhaps sloppily, under the guise of a brief "emergency" interview, and gives law enforcement little reason to make follow-up inquiries or to establish and maintain relationships with witnesses (something that is particularly important in alleged domestic violence situations where the danger is always present that the victim will return to an abusive relationship). See Robert C. Davis et al., A Comparison of Two Prosecution Policies in Cases of Intimate Partner Violence: Mandatory Case Filing vs. Following the Victim's Lead, Center For Court Innovation 80 (2007), available at http://www.courtinnovation.org/sites/default/files/Case_Processing_Report.pdf (determining that "the key role played by the police in influencing victims' responses to later contacts they will have with the criminal justice system" is a "positive interaction with the police[, which] helped convince victims that they should cooperate in prosecution.").

requires reversal. In light of the record evidence objectively demonstrating that Ms. Parker's primary purpose was to report criminal activity to the police, and in the absence of any evidence supporting a determination that the police and Ms. Parker spoke with a primary purpose to resolve an ongoing emergency, the government had an obligation to present Ms. Parker's accusations against Mr. Frye through her live, in-court testimony. Thus, Mr. Frye's Sixth Amendment right to confrontation was violated when the government presented Ms. Parker's accusatory statements through the testimony of Officer Phillips.