*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CM-224

DANNY ANDRADE, APPELLANT,

V.

UNITED STATES, APPELLEE.

*Julio A. Castillo*
JULIO A. CASTILLO
Clerk of the Court

Appeal from the Superior Court
of the District of Columbia
(DMV-2426-12)

(Hon. Fern Flanagan Saddler, Trial Judge)

(Argued October 8, 2014                                        Decided January 8, 2015)

*Thomas D. Engle*, with whom *Sharon L. Burka* was on the brief, for appellant.

*Adrienne Gurley*, Assistant United States Attorney, for appellee. *Ronald C. Machen, Jr.*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen Kolb*, *Danny Nguyen*, and *Ademuyiwa Bamiduro*, Assistant United States Attorneys, were on the brief for appellee.

Before WASHINGTON, *Chief Judge*, and BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*.

MCLEESE, *Associate Judge*: Appellant Danny Andrade seeks reversal of his conviction for assault. Mr. Andrade contends that his Sixth Amendment right to

confront witnesses against him was violated by the admission of evidence that the complainant, who did not testify at trial, made statements about the alleged assault to the police officer who responded to the complainant's 911 call. We agree and therefore reverse Mr. Andrade's conviction.

## I.

The United States's evidence at trial indicated the following. In November 2012, Shawnice Reed called 911. Ms. Reed indicated that she and her boyfriend Danny Andrade had gotten into an argument and that Mr. Andrade "been putting his hands on [Ms. Reed]." Ms. Reed, who sounded excited and upset on the 911 recording, asked the dispatcher to send the police, saying that she had locked herself in the bathroom but that Mr. Andrade was about to come into the bathroom. As the 911 call continued, Ms. Reed said that Mr. Andrade left the house, got on a bike, and went down the street. Ms. Reed then said that the police had arrived and that she was going to go speak to them.

Officer James Love and his partner went to Ms. Reed's residence in response to the 911 call. They arrived less than five minutes after they were advised of the call. Ms. Reed met them at the front door, and they walked inside to

the living room and began to interview her. Ms. Reed was crying, stuttering, shaking, and obviously upset. Officer Love, who had been to the residence before, asked Ms. Reed whether the police had been called because of an incident between Ms. Reed and Mr. Andrade. After Ms. Reed said yes, Officer Love asked what had occurred between them. Still very upset and crying, Ms. Reed gave the following account to Officer Love. Ms. Reed and Mr. Andrade got into an argument, and Mr. Andrade tried to push her down the steps. After Ms. Reed started to go down the steps, Mr. Andrade came after her, grabbed her by the hair, and hit her several times in the back of the head and the neck. Ms. Reed broke free, but Mr. Andrade grabbed her, putting both of his hands on the front of her neck. Finally, Ms. Reed broke free again, ran into the bathroom, locked herself in, and called 911.

At the time that he obtained Ms. Reed's account of the incident, Officer Love believed that Mr. Andrade was no longer in Ms. Reed's residence, and Officer Love perceived no immediate danger. He questioned Ms. Reed in order to confirm Mr. Andrade's involvement and to get the information the police needed to search for Mr. Andrade.

Officers searched for Mr. Andrade but could not locate him. Later that evening, Officer Love returned to Ms. Reed's residence, in response to a call concerning an unwelcome guest. When he arrived, he saw Mr. Andrade outside Ms. Reed's residence. Mr. Andrade said that he wanted Ms. Reed to be removed from the residence, but Officer Love instead arrested Mr. Andrade for assault in connection with the earlier incident.

## II.

In criminal trials, the Confrontation Clause of the Sixth Amendment generally forbids the admission of evidence of out-of-court "testimonial" statements made by a non-testifying witness. *See Michigan v. Bryant*, 131 S. Ct. 1143, 1153 (2011). Out-of-court statements made in response to police questioning are non-testimonial if the primary purpose of the questioning is "to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006).[1] In determining the primary purpose of police questioning, courts "objectively evaluate the circumstances in which the encounter

---

[1] Statements can be non-testimonial in other circumstances. *Bryant*, 131 S. Ct. at 1155. In the present case, the trial court admitted Ms. Reed's statements solely on the ground that the statements were directed at responding to an emergency. The United States defends the trial court's ruling solely on that ground. We therefore confine our analysis to that ground.

occurs and the statements and actions of . . . both the declarant and [the] interrogators . . . ." *Bryant*, 131 S. Ct. at 1156, 1160. "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry," and "must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight." *Id.* at 1158, 1157 n.8. Even if no emergency actually existed at the time of the questioning, it is sufficient for purposes of the Confrontation Clause "[i]f the information the parties knew at the time . . . would lead a reasonable person to believe that there was an emergency . . . ." *Id.* at 1157 n.8. The government bears the burden of establishing that a proffered out-of-court statement made by a non-testifying witness is not testimonial. *Frye v. United States*, 86 A.3d 568, 571 (D.C. 2014). We review de novo a trial court's ruling that a statement is not testimonial. *Graure v. United States*, 18 A.3d 743, 756 n.16 (D.C. 2011).

To determine whether Ms. Reed's statements to Officer Love were testimonial or were instead directed at responding to an ongoing emergency, we must consider both Officer Love's perspective and Ms. Reed's perspective. *See Bryant*, 131 S. Ct. at 1156, 1160. We turn first to Officer Love's perspective. Ms. Reed was crying and appeared obviously upset to Officer Love, which provides some support for a finding of ongoing emergency. *See, e.g.*, *Frye*, 86 A.3d at 573

(declarant's "acute emotional distress" provides support for finding that statement was non-testimonial). But a number of considerations point in the opposite direction. At the time Officer Love asked Ms. Reed what happened, he was aware that he was responding to a report of domestic violence and that Mr. Andrade was the suspect. Moreover, Officer Love believed that Mr. Andrade was not in the residence.[2] *See, e.g.*, *Bryant*, 131 S. Ct. at 1159 (domestic-violence suspect's departure from crime scene provides support for conclusion that there is no ongoing emergency); *Davis*, 547 U.S. at 828-29 (same). Officer Love apparently saw nothing that led him to think that Ms. Reed was in immediate danger. There was no evidence that Officer Love saw any injuries to Ms. Reed. *See, e.g.*, *State v. Lucas*, 965 A.2d 75, 86 (Md. 2009) (lack of evidence that declarant appeared to need medical attention provides support for conclusion that there is no ongoing emergency). Nor was there any evidence that Officer Love had reason to believe that a weapon had been involved in the incident. *See, e.g., Bryant*, 131 S. Ct. at 1158-59 (absence of weapon provides support for conclusion that there is no

---

[2] Officer Love suggested at trial that he had been aware when he questioned Ms. Reed that Ms. Reed had said during the 911 call that Mr. Andrade had ridden away on a bicycle. The government objected to that testimony as non-responsive, and the trial court sustained the objection but did not strike the testimony. The parties dispute whether the testimony is part of the record, but we need not resolve that dispute. For current purposes, we assume that the record is silent as to whether Officer Love knew that Ms. Reed had told the 911 operator that Mr. Andrade had ridden away on a bicycle.

ongoing emergency).

The United States argues, however, that Officer Love needed to get an account from Ms. Reed in order to determine whether there was an emergency, because he "had no information" about whether weapons had been involved, whether Ms. Reed needed medical attention, whether others had been involved, and where Mr. Andrade was. In fact, we do not know exactly what information Officer Love had when he questioned Ms. Reed, because no one asked that question at trial. If Officer Love was aware of the contents of the 911 call, then he did have information suggesting that only Mr. Andrade was involved, because Ms. Reed mentioned no one else; that no weapons were used, because Ms. Reed did not mention a weapon and instead referred only to Mr. Andrade's hands; and that Mr. Andrade had ridden away on a bike. Similarly, no one asked Officer Love whether Ms. Reed had any visible injuries or displayed any signs of physical pain. As we have noted, it was the United States's burden to establish that Ms. Reed's statements were non-testimonial. The United States did not establish at trial that Officer Love was unaware of the information in the 911 call, and we cannot simply assume such lack of awareness. Nor can we assume that Officer Love had no information about whether Ms. Reed might need medical attention, because we do not know what Officer Love may have observed and reasonably concluded about

Ms. Reed's physical condition.

Turning to Officer Love's "statements and actions," the circumstances of the questioning appear to have been informal and unstructured, which provides support for a conclusion that the statements at issue were not testimonial. *See, e.g.*, *Bryant*, 131 S. Ct. at 1166. On the other hand, Officer Love did not ask questions specifically directed at possible emergencies, such as "Are you hurt?"; "Do you need medical attention?"; "Was a weapon involved?"; or "Did he say anything about coming back or about harming anyone else?" *See, e.g., State v. Clue*, 55 A.3d 311, 319 (Conn. App. Ct. 2012) (finding statements on 911 call non-testimonial where 911 operator's questions were "directed explicitly toward resolving the emergency situation and ascertaining whether [declarant] was injured and/or needed assistance"). Rather, after confirming that Mr. Andrade was involved, Officer Love simply asked Ms. Reed what had occurred. We do not mean to suggest that such an open-ended question will necessarily result in testimonial statements. To the contrary, such a question can in some circumstances be a natural way to determine whether there is an emergency and if so how to respond to it. *See, e.g.*, *Bryant*, 131 S. Ct. at 1165-66 ("What happened?" -- directed to a victim who had been shot by an unknown assailant -- was the "exact type of question[] necessary to allow the police to assess the

situation, the threat to their own safety, and possible danger to the potential victim and to the public . . . .") (internal quotation marks omitted). But unlike questions more specifically tailored to identifying whether an emergency exists, questions such as "What happened?" are also natural ways for an investigating officer to try to "establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822 (statement is testimonial if "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").

Finally, we note that Officer Love's stated reasons for questioning Ms. Reed were to confirm Mr. Andrade's involvement and to get the information the police needed to search for Mr. Andrade. Officer Love did not suggest that he was questioning Ms. Reed to gather information in order to address a possible emergency; rather, Officer Love appears simply to have been gathering information so that the police could apprehend a suspect in a completed offense. The United States argues, however, that Officer Love's subjective purpose in questioning Ms. Reed is irrelevant, because the inquiry into the primary purpose of the questioning is objective in character. The United States's argument finds support in *Bryant*, where the Supreme Court explained that "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular

encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." 131 S. Ct. at 1156. On the other hand, the Supreme Court in *Davis* appeared to treat as relevant an officer's testimony about the purpose of police questioning. 547 U.S. at 829. Moreover, in at least one other setting the Supreme Court has treated the subjective purpose of a police questioner as relevant in determining how an objectively reasonable officer would have viewed the questioning. *See Rhode Island v. Innis*, 446 U.S. 291, 301 & n.7 (1980) (purpose of police in questioning suspect is relevant to whether police should have known that questioning was reasonably likely to elicit incriminating response); *see also United States v. Brown*, 737 A.2d 1016, 1016 (D.C. 1999) ("Although the intent of the police is not irrelevant, the [*Innis*] standard remains an objective one . . . .") (citation, brackets, and internal quotation marks omitted). We need not decide whether the United States is correct that Officer Love's stated reasons for questioning Ms. Reed are irrelevant. Instead, we simply assume the point for current purposes.

Shifting to Ms. Reed's perspective, Ms. Reed knew at the time she answered Officer Love's question that she had already reported the incident to the police, that she had told the police that Mr. Andrade was involved, that she had mentioned

no other participants, that she had not mentioned a weapon, that she had not mentioned any injuries or need for medical assistance, and that she had told the police that Mr. Andrade had ridden away on a bicycle. There was no evidence that Ms. Reed had specific reason to fear that Mr. Andrade was planning to return soon or that he posed an immediate threat to any other person. Nor was there evidence that Ms. Reed had suffered injuries requiring medical attention. Finally, Officer Love's open-ended question would not reasonably have signaled to Ms. Reed that Officer Love was seeking information to address an ongoing emergency rather than to investigate past criminal conduct.

Ms. Reed's answers to Officer Love's question also do not suggest a focus on dealing with an emergency. Ms. Reed did not request medical assistance, ask the police to take any other emergency steps, or communicate any other information indicating that there was an ongoing emergency. Rather, Ms. Reed simply described the circumstances of the earlier incident. *See, e.g.*, *Davis*, 547 U.S. at 830 (in finding statement testimonial, Court emphasizes that statement "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed").

Considering the circumstances in their totality, we find that the United States

did not carry its burden of establishing that the primary purpose of the questioning in this case was to enable the police to meet an ongoing emergency. At bottom, the United States established only that Ms. Reed had just reported a domestic-violence incident, that she was very upset, that the alleged perpetrator was no longer on the scene but had not yet been located, and that the questioning was relatively informal. The Supreme Court has twice suggested that comparable circumstances do not suffice to render statements non-testimonial. *Bryant*, 131 S. Ct. at 1159 (suggesting that there is no ongoing emergency if suspect involved in "private dispute," such as domestic-violence incident, "flees with little prospect of posing a threat to the public"); *Davis*, 547 U.S. at 828 (Court states that "the emergency appears to have ended (when [the domestic-violence suspect] drove away from the premises)" and that statements given thereafter in response to questions by 911 operator "could readily be maintained" to have been testimonial); *cf. id.* at 829-32 (in companion case, *Hammon v. Indiana*, Court holds that oral statements made by domestic-violence complainant to police officers were testimonial, where there was no emergency in progress when officers arrived on scene; complainant initially told police things were fine; officers separated complainant and suspect; statements recounted details of completed incident; and officer ultimately had complainant execute affidavit).

Numerous other courts have held statements to be testimonial in circumstances comparable to those of the present case. *See, e.g.*, *Lucas*, 965 A.2d at 76-87 (statements by domestic-assault complainant were testimonial, where statements were made in response to questioning by officers responding to 911 call; complainant was crying and upset; no one else was in apartment; one officer had waited outside with person who turned out to be defendant; although complainant had swollen eyes and marks on neck, there was no evidence that she had injuries requiring medical attention; and statements recounted circumstances of completed offense); *Commonwealth v. Lao*, 877 N.E.2d 557, 561, 565-66 (Mass. 2007) (same where complainant, who told officer that assailant had threatened her and tried to run her over, had made several phone calls after incident and before calling 911; complainant was not in peril at time of statements, because alleged assailant had left); *State v. Moua Her*, 750 N.W.2d 258, 265-69 (Minn. 2008) (same where police officer spoke to complainant in public place right after alleged assault; assailant was not present; there was no evidence that assailant intended to return to assault complainant or posed threat to others; and although complainant was clearly upset and appeared to have injuries, there was no evidence that officer thought complainant needed medical attention), *cert. granted, vacated, and remanded on other grounds*, 555 U.S. 1092 (2009), *opinion on remand*, 781 N.W.3d 869 (Minn. 2010); *State v. Mechling*, 633 S.E.2d 311, 315, 323-25 (W.

Va. 2006) (same where complainant was crying and "really shook up"; there was no emergency in progress when officers arrived, because assailant had clearly departed); *Wright v. State*, 434 S.W.3d 401, 402-08 (Ark. Ct. App. 2014) (same where officer found complainant, who was "in and out of a panic state," suffering from multiple stab wounds; while awaiting ambulance, officer "got as much information from [complainant] as [he] possibly could"; assailant had left area); *Dixon v. State*, 244 S.W.3d 472, 486-87 (Tex. App. 2014) (same where officer responded to 911 call reporting that assault had just happened; assault had taken place elsewhere; complainant had then gone home, and assailant was not present; complainant was very upset and scared, and expressed concern that assailant might bother her; complainant had knot under her eye; and officer testified that he collected information to provide to prosecutor); *Zapata v. State*, 232 S.W.3d 254, 256-60 (Tex. App. 2007) (same where complainant was crying and shaking and had scratches, red mark, and bruise; when police arrived, complainant was outside residence and assailant was inside residence; officer testified that she was gathering evidence for prosecution).

None of the cases cited by the United States are to the contrary, because none involve circumstances comparable to those of the present case. The Supreme Court in *Bryant* held that the statements at issue in that case were not testimonial,

but those statements were obtained from a victim who was lying on the ground in a gas station with a gunshot wound to the abdomen. 131 S. Ct. at 1150. The Court in *Bryant* emphasized the severity of the victim's injuries and the possible threat to the public posed by a shooting suspect whose motives for shooting the victim were unknown. *Id.* at 1163-66. The Court also distinguished its earlier holding in *Hammon*, the companion case to *Davis*, explaining that the statements deemed testimonial in *Hammon* arose in the context of a domestic-violence assault that involved neither a weapon nor serious injury. *Id.* at 1158-59.

The United States also relies on our recent decision in *Frye*, but that case involved very different circumstances. The police in *Frye* responded to a 911 call from a child for an assault in progress. 86 A.3d at 569. When they arrived at the residence in question, they found a man and a woman shouting at each other. *Id.* There were also five children in the residence. *Id.* The defendant had a fist clenched, and the woman was backing away and appeared nervous. *Id.* As the police separated the man and the woman, an officer asked the woman what happened. *Id.* at 569-70. At the time he asked the woman what happened, the officer knew only that he was responding to a report by a child that the child's parents were fighting. *Id.* at 570. The officer did not know the number of people involved in the incident, the identity of the assailant, or whether a weapon was

involved. *Id.* at 570. As she responded, the woman was shaking and crying, had visible abrasions, and appeared to be in need of medical assistance. *Id.* at 570. Meanwhile, the man, who was five to ten feet away in a different room, had his fists balled up and was speaking loudly to a different officer. *Id.* As he was removed from the residence soon afterwards, the man kicked luggage and other items. *Id.* at 573.

In concluding that the woman's response to the officer's question was not testimonial, this court emphasized a number of circumstances that are not present in this case: the officers arrived in the middle of a heated argument; there were a number of children present who needed to be protected; the woman appeared to need medical assistance; and the officers were still trying to clarify and control a fluid, confused, and volatile situation. *Frye*, 86 A.3d at 571-74. The conclusion that the questioning in *Frye* had the primary purpose of addressing an ongoing emergency thus does not support the same conclusion in the present case. The other cases relied upon by the United States are similarly distinguishable. *See, e.g.*, *Smith v. United States*, 947 A.2d 1131, 1133-35 (D.C. 2008) (statements made by domestic-violence complainant during 911 call were not testimonial; complainant was summoning help to deal with emergency, complainant feared further assault and was unsure whether assailant was still in residence, and

complainant had suffered injuries and requested ambulance); *Long v. United States*, 940 A.2d 87, 90-99 (D.C. 2007) (statements made by assault complainant were not testimonial; complainant was extremely upset, had visible injury to head, and was covered in blood; complainant flagged police officer down but did not directly respond to officer's questions, instead saying "Look what she did to my face." and "[S]he cut my face."; when defendant walked into area, complainant exclaimed "There she is!"); *Lewis v. United States*, 938 A.2d 771, 773-82 (D.C. 2007) (initial statements made by assault complainant to police officer were not testimonial; complainant was crying and very upset, was bleeding from multiple lacerations from head and face, and had large amount of blood on her shirt; officer asked if complainant needed medical assistance and complainant indicated that she did; at time officer asked complainant what happened, officer did not know identity of assailant or whether assailant was armed; officer's questions were designed to gather information to respond to emergency).

In sum, we hold that Ms. Reed's statements to Officer Love were testimonial. We further conclude that the admission of evidence about those statements was not harmless beyond a reasonable doubt. *See, e.g.*, *Lewis*, 938 A.2d at 776 (erroneous admission of testimonial statements requires reversal unless harmless beyond reasonable doubt). But for Ms. Reed's statements to Officer

Love, the only description of the assault would have been Ms. Reed's vague statement during the 911 call that Mr. Andrade "been putting his hands on [her]." That Ms. Reed's statements to Officer Love were the crux of the prosecution's case is demonstrated by the emphasis given to those statements by the prosecutor in closing argument. *See, e.g.*, *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004) ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was . . . prejudicial.") (brackets and internal quotation marks omitted). Moreover, the trial court clearly viewed Ms. Reed's statements to Officer Love as critical, because it relied entirely on those statements, rather than on the contents of the 911 call, when explaining the reasons for its verdict. Under the circumstances, we conclude that reversal is required. *See Drayton v. United States*, 877 A.2d 145, 151 (D.C. 2005) (accepting United States's concession that admission of testimonial statements required reversal, where trial court in bench trial "based its verdict entirely on [the] statements").[3]

---

[3] Given our disposition of the case, we see no need to address Mr. Andrade's claim that, by the manner in which it advised Mr. Andrade about the right not to testify, the trial court chilled Mr. Andrade's exercise of the right to testify. We do, however, briefly address Mr. Andrade's challenge to the admissibility of Ms. Reed's 911 call as an excited utterance, because that issue could be expected to arise in any retrial. In this court, Mr. Andrade argues that there was inadequate information about how much time passed between the alleged assault and the 911 call. It is unclear whether Mr. Andrade raised that argument in the trial court. In

(continued . . .)

The judgment of the trial court is therefore reversed, and the case is remanded for further proceedings.

*So ordered.*

---

(. . . continued)

any event, the 911 call's contents permit a reasonable inference that the call "was made within a reasonably short period of time after the startling event." *Castillo v. United States*, 75 A.3d 157, 164 (D.C. 2013). Specifically, Ms. Reed, who sounded excited and upset in the 911 call, said that she had locked herself in the bathroom and expressed concern that appellant was about to come in.