# District of Columbia
# Court of Appeals

**No. 14-CM-208**

ANDREW WILLS,

Appellant,

v.

FILED

OCT **13** 2016

DISTRICT OF COLUMBIA
COURT OF APPEALS

**DVM-2423-13**

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:  BECKWITH and MCLEESE, *Associate Judges;* and REID, *Senior Judge*.

**J U D G M E N T**

This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument.  On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's conviction for attempted theft is reversed, and the matter is remanded to the Superior Court for further proceedings.  Appellant's assault conviction is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: October 13, 2016.

Opinion by Associate Judge Corinne Beckwith.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CM-208

ANDREW WILLS, APPELLANT,

V.

UNITED STATES, APPELLEE.

FILED 10/13/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(DVM-2423-13)

(Hon. Rhonda Reid Winston, Trial Judge)

*Christine Pembroke* was on the brief for appellant.

*Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *James A. Ewing*, Assistant United States Attorneys, were on the brief, for appellee.

(Submitted January 7, 2015                    Decided October 13, 2016)

Before BECKWITH and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

BECKWITH, *Associate Judge*: After a bench trial, the trial judge in this case convicted appellant Andrew Wills of simple assault[1] and attempted second-degree

---

[1] D.C. Code § 22-404 (2012 Repl.).

theft[2] stemming from an altercation between Mr. Wills and his wife in a gas station parking lot. Mr. Wills contends that his wife's on-the-scene statement that Mr. Wills "snatched" her keys from her—uttered in response to a police officer's question about "how he got the keys"—was admitted in violation of the Confrontation Clause of the Sixth Amendment of the U.S. Constitution. U.S. Const. amend. VI, cl. 2. We conclude that the complainant's statement was "testimonial" under this court's and the Supreme Court's Confrontation Clause decisions, that Mr. Wills has satisfied the requirements of the plain error test that applies to his claim, and that his conviction for attempted theft must therefore be reversed. We affirm Mr. Wills's conviction for assault, however, because the admission of the complainant's statement did not affect the assault charge and because we find no merit in Mr. Wills's other claims challenging that conviction.

**I.**

Ndya Silas testified that she was coming out of a gas station convenience store in Northeast Washington, D.C., one evening when she heard a scream. She turned and saw a man on top of a woman inside a yellow Ford Mustang that was

---

[2] D.C. Code §§ 22-1803, -3211, -3212 (b) (2012 Repl.).

parked near the station's air pump.[3] The man, whom she described as wearing a black jacket and jeans, struck the woman at least once with his fists and pulled her out of the car by her hair. Ms. Silas called 911 and reported the assault to the police, who arrived about two minutes later. She testified that she did not hang up the phone until she saw the police arriving at the gas station with their lights on, that she left the scene when the police arrived, and that the man she saw striking the woman did not leave the scene. A recording of Ms. Silas's 911 call reporting these observations was played at trial.

Over defense counsel's objection on both hearsay and Confrontation Clause grounds, the government introduced a recording of another 911 call—this one placed by an unidentified caller who stated that he was at a gas station watching a man and a woman "physically arguing" near a yellow Mustang. The caller also stated that the man, whom he (like Ndya Silas) described as wearing a black jacket and jeans, had thrown a set of car keys "over onto the highway."

Metropolitan Police Department Sergeant Brett Parson testified that he responded to "a radio assignment for an assault in progress." When he arrived at the gas station, he saw two people next to a yellow Mustang—a woman seated on a

---

[3] According to Ms. Silas, neither the Mustang nor a red truck parked near it was there two minutes earlier when she walked into the store to buy a snack.

step and a man standing above her. The woman was crying and "breathing a little heavily." The officer exited his police car and "motioned to the female to come to [him]." According to Sergeant Parson, she got up "very quickly" and walked over to him, looking over her shoulder toward the man as she approached the officer. The officer asked if she was okay and she "answered in the affirmative." Pointing to Kenilworth Avenue, she then told him, "You need to get my phone. He threw my phone into the street. . . . And he's got my keys. You need to get my keys." The officer then asked "how he got the keys," to which she responded, "He snatched them from me." Sergeant Parson then called another officer over to conduct a "more thorough interview." A third officer later recovered keys from the man at the scene, whom Sergeant Parson identified at trial as the appellant, Andrew Wills. According to Sergeant Parson, the woman at the scene described herself as Mr. Wills's wife, though her name was never introduced into evidence.

The trial court found Mr. Wills guilty of attempted second-degree theft and assault.[4] The court first determined that Mr. Wills was the person who committed the assaults described by Ms. Silas and the anonymous 911 caller. The court then also found, based on Sergeant Parson's recounting of the complainant's statements,

---

[4] The government dismissed a third charge, destruction of property (for allegedly throwing the complainant's cell phone), at the close of its case.

that Mr. Wills took his wife's keys with the intent to deprive her of those keys. Mr. Wills timely appealed.

## II.

Mr. Wills contends that the admission of his wife's statement that he "snatched" her keys violated his constitutional right to confrontation.[5] The Confrontation Clause "guarantees a defendant's right to confront those who bear testimony against him," *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (internal citations and quotation marks omitted), and ensures that he has a "full and fair opportunity" to challenge the evidence against him through adversarial cross-examination of the government's witnesses. *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). It is not enough for the government to present reliable evidence; the Confrontation Clause requires that "reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford v. Washington*, 541 U.S. 36, 61 (2004). The protection is thus procedural, reflecting the Framers' judgment "about how reliability can best be determined" to ensure

---

[5] Mr. Wills argues that the admission of the complainant's other statements—including "he's got my keys" and "[y]ou need to get my keys"—also violated his right to confrontation. Because our analysis of the "snatch[ing]" statement is dispositive, we need not decide whether these other statements should have been excluded.

fairness in the criminal justice system. *Id.*

As the U.S. Supreme Court has interpreted it, the Confrontation Clause bars admission of "testimonial" out-of-court statements unless the witness testifies at trial or the witness is unavailable and the defendant has had prior opportunity for cross-examination. *Id.* at 68. In the consolidated cases *Davis v. Washington* and *Hammon v. Indiana*, 547 U.S. 813 (2006), which both involved the admissibility of the complainant's out-of-court statements about a domestic dispute, the Supreme Court held that statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Statements are testimonial, however, "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 822.

Mr. Wills's trial counsel never argued to the trial court that the complainant's statements were testimonial and that they should be excluded on Confrontation Clause grounds. He objected to the statements' admission, but only on hearsay grounds, prompting a discussion about whether they were admissible as excited utterances and ultimately a ruling by the trial court that they were. Because

Mr. Wills's trial counsel argued only that the complainant's statements were inadmissible hearsay, we apply a plain-error standard of review to his constitutional claim. *Long v. United States*, 940 A.2d 87, 91 (D.C. 2007); *Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006). Under that standard, Mr. Wills must show error that is plain, that affected his substantial rights, and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Guevara v. United States*, 77 A.3d 412, 418 (D.C. 2013).

### A. Error

Here, the complainant did not testify at trial and Mr. Wills did not have prior opportunity to cross-examine her, so Mr. Wills's Confrontation Clause claim turns on whether the complainant's statement that he "snatched" her keys was "testimonial" under *Crawford*. In assessing the testimonial nature of statements made when police respond to an emergency call for help, we "objectively evaluate" the circumstances and "the statements and actions of both the declarant and [the] interrogators," and we consider these circumstances from the perspectives of both parties to the interrogation. *Michigan v. Bryant*, 562 U.S. 344, 359, 367 (2011).

Turning first to Sergeant Parson's actions and the events from his viewpoint, the record is silent as to whether the officer knew what the 911 callers had reported

as he drove to the gas station within minutes of receiving a call about an assault in progress. When he arrived, by all indications the incident was over, and the evidence did not suggest that the scene he arrived to was volatile or chaotic. Sergeant Parson had the support of at least two other officers who arrived in marked cruisers at the same time he did, he testified that there were "people coming and going from the gas station that didn't pay much of a mind," and he immediately separated the complainant from Mr. Wills by motioning her over to him. The officer did not testify that he saw any weapons, Mr. Wills and the complainant were not physically fighting or arguing, and although the complainant was crying and breathing heavily—facts that in some cases could suggest an ongoing emergency[6]—she had no apparent injuries. Though Mr. Wills was still on the scene and was described as standing over the complainant when Sergeant Parson first arrived, and though the complainant looked back at Mr. Wills when she walked toward the officer, Sergeant Parson did not approach the scene as would an officer expecting to encounter armed and dangerous individuals, drawing his gun, for example, or ordering Mr. Wills onto the ground or away from his wife.

---

[6] *Andrade v. United States*, 106 A.3d 386, 389 (D.C. 2015) (that the complainant "was crying and appeared obviously upset" provided "some support for a finding of ongoing emergency"); *Frye v. United States*, 86 A.3d 568, 573 (D.C. 2014) (stating that the declarant's "acute emotional distress" supported a finding that her statement was nontestimonial).

Particularly after the complainant was standing with Sergeant Parson away from Mr. Wills and immediately assured the officer that she was okay, the officer had no grounds apparent from the record for thinking the complainant was still in danger. By the time Sergeant Parson was questioning the complainant about how Mr. Wills had come into possession of her keys, another officer was with Mr. Wills. *See Hammon,* 547 U.S. at 831 (distinguishing testimonial statements in *Hammon* from nontestimonial statements in *Davis*, which were taken when the complainant was "unprotected by police" and thus "apparently in immediate danger from Davis").

Sergeant Parson's first question to the complainant—was she okay?—was the sort that in some circumstances might be directed at a possible emergency. *Andrade v. United States*, 106 A.3d 386, 390 (D.C. 2015) (noting that questions "such as 'Are you hurt?'; 'Do you need medical attention?'; 'Was a weapon involved?'; or 'Did he say anything about coming back or about harming anyone else?'" are "questions specifically directed at possible emergencies"). Yet any prospect that Sergeant Parson would need to act to protect the complainant or seek medical treatment on her behalf faded when she said—and he saw—she was okay. The officer's next question—how did the man get the keys?—seems a straightforward investigative inquiry, a "natural way[] for an investigating officer to try to 'establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *Davis*, 547 U.S. at 822).

The government contends that Sergeant Parson's question about how Mr. Wills got his wife's keys evinced an attempt to assess "whether or not appellant was lawfully in possession of the keys or whether appellant had some sort of weapon that he used to take possession of the keys—rather than preparation for a future criminal prosecution." Setting aside that Sergeant Parson never described the purpose of his questioning that way,[7] this observation actually bolsters Mr. Wills's position given the absence of any reason to think Mr. Wills was armed. *See Andrade*, 106 A.3d at 389 (rejecting the government's unsubstantiated argument that the officer did not know "whether weapons had been involved" and thus "needed to get an account from [the complainant] in order to determine whether there was an emergency"); *Bryant*, 562 U.S. at 364 (noting the importance of evidence regarding the presence of a weapon and the type of weapon to the question whether there was an ongoing emergency). Similarly, the government's portrayal of Sergeant Parson as trying to determine whether Mr. Wills was in lawful possession of the keys suggests the officer's interest in investigating criminal conduct that had already occurred, lending further support to the

---

[7] *Cf. Andrade*, 106 A.3d at 390–91 (assuming without deciding that the officer's stated reasons for questioning the complainant were irrelevant while noting that "the Supreme Court in *Davis* appeared to treat as relevant an officer's testimony about the purpose of police questioning").

conclusion that "the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Hammon*, 547 U.S. at 830.

Considering the complainant's actions and statements and the situation from her perspective, her matter-of-fact answers to the officer's questions—that yes she was okay, that Sergeant Parson "need[ed] to get [her] phone" and "need[ed] to get [her] keys," and that Mr. Wills had snatched her keys—do not suggest an emergency was under way. On the contrary, the complainant's statement that Mr. Wills had taken her property was a straightforward reporting of a past event that police had a duty to investigate. *See Hammon*, 547 U.S. at 830 ("[I]nvestigat[ing] a possible crime . . . is, of course, precisely what the officer *should* have done."). The government argues that the fact that the complainant said nothing to the police about the assault against her shows that she was "merely attempting to gain the police's assistance to leave a volatile situation," not "attempting to make a record for a future trial." The more objective (and less speculative) relevance of that omission to the Confrontation Clause analysis, however, is that it tends to show that the complainant was not specifically seeking physical protection or medical assistance when she was responding to the officer's questions. *See Andrade*, 106 A.3d at 391 ("[The complainant] did not request medical assistance, ask the police to take any other emergency steps, or communicate any other information indicating that there was an ongoing emergency. Rather, [she] simply described

the circumstances of the earlier incident." (citations omitted)). As Sergeant Parson pointed out, another officer promptly conducted "a more thorough interview"—an interview that was not introduced at trial and that the government in its brief concedes "potentially would have been closer to the 'testimonial' line." The government is not contending, therefore, that Mr. Wills's wife *never* mentioned the assault to police on the scene, only that she did not mention it at the outset to Sergeant Parson. Moreover, the government's acknowledgement that the second officer's interview may have produced testimonial statements is telling given that it was conducted in the immediate wake of the statement at issue in this appeal and inevitably shared most if not all of the hallmarks of the initial questioning.

The circumstances of this case most relevant to the Confrontation Clause analysis replicate those in the Supreme Court's decision in *Hammon*. In *Hammon*, when police arrived at the home of Hershel and Amy Hammon after a report of a "domestic disturbance," they found Amy on the front porch—appearing "somewhat frightened" but telling police that "nothing was the matter"—and Hershel in the kitchen. 547 U.S. at 819. They also saw, in the corner of the living room, a gas heating unit with pieces of glass on the floor in front of it and flames coming out of the front of the unit. *Id.* Hershel told police that he and Amy had been in an argument but that "everything was fine now" and that it "never became physical." *Id.* When another officer went to the living room to talk to Amy,

Hershel "made several attempts to participate in Amy's conversation with the police" and "became angry" when police kept them separated. *Id.* at 819–20. Amy told the officer what had happened, then penned a handwritten affidavit indicating that Hershel had broken the furnace and shoved her down into the broken glass. *Id*. at 820. Amy did not appear at Hershel's trial on domestic battery charges, but he was convicted after the government presented the officer's testimony about what Amy told him had happened and Amy's affidavit to the judge presiding at the bench trial. *Id*. at 820–21.

The Supreme Court held that it was "entirely clear" from these circumstances "that the interrogation was part of an investigation into possibly criminal past conduct." *Id.* at 829. In reaching that conclusion, the Court emphasized several circumstances that are also present here: though Hershel Hammon was present, there was "no emergency in progress," there was "no immediate threat to [the complainant's] person," and the complainant told police she was all right. *Id.* at 829–30. The officer's questions—like Sergeant Parson's question here about how Mr. Wills got the keys—sought to determine "what happened" rather than "what is happening." *Id.* at 830. Here, as in *Hammon,* the complainant's statement "took place some time after the events described were over" and "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed." *Id*. "Such statements

under official interrogation are an obvious substitute for live testimony, because they do precisely what a witness does on direct examination; they are inherently testimonial." *Id.* (emphasis omitted).

The government contends that *Hammon* is distinguishable because the police there saw no emergency in progress or immediate threat to the complainant. But we have already concluded the same is true here. Noting that Amy Hammon had assured police that everything was fine, *id.* at 819, the government also suggests that Amy's statements were more deliberate and that more time passed before she uttered them. The cases are factually more alike than the government allows, however. Mr. Wills's wife also told police that she was okay. And the interrogation in both cases took place on the scene not long after the offense each complainant was describing. When the Supreme Court noted that "Amy's narrative of past events was delivered at some remove in time from the danger she described," its focus was more on the fact that the incident was *over* than that it was *long* over. *Id.* at 832; *see id.* at 830 (noting that Amy Hammon's statement "took place some time after the events described were over"); *see also, e.g.*, *id.* at 829 (noting that when police arrived, they "heard no arguments or crashing and saw no one throw or break anything"). Several factual differences only paint the situation in *Hammon* as more potentially volatile than that here. Unlike in *Hammon*, for example, where Hershel Hammon was angry and trying to interfere

with the officer's questioning of his wife, the record here is devoid of evidence that Mr. Wills was disruptive or dangerous. And Amy Hammon's statements that "nothing was the matter" and that "things were fine" were less than reassuring when there were flames coming out of the broken heating unit and pieces of glass strewn about the living room floor. *Id*. at 819, 830.

And finally, the statements that the Supreme Court found to be testimonial in *Hammon* were not more deliberate than the statement at issue here. As an initial matter, informal statements in response to police questioning can be testimonial "whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer," *id*. at 826, and the Court held in *Hammon* that Amy Hammon's initial oral statements, not just her subsequent written affidavit, were admitted in violation of the Confrontation Clause. *Id.* at 830–32. The Court also emphasized that Amy's statements were testimonial even though her questioning was far less formal than the tape-recorded stationhouse interrogation at issue in *Crawford*. *See id.* at 830 (citing *Crawford*, 541 U.S. at 53 n.4).

"Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken

for use at trial." *Bryant*, 562 U.S. at 358. In our recent decision in *Andrade v. United States*, that constitutional objective was evaded where the police, having arrived at the scene less than five minutes after receiving a 911 call about a domestic assault, promptly asked a crying and still upset complainant what had happened. 106 A.3d at 387–88. The "relatively informal" nature of the police questioning in *Andrade* did not preclude the complainant's statements in response to that questioning from being deemed testimonial, *id.* at 389, 391, 393, and it does not preclude us from reaching the same conclusion based on the comparable interrogation of the complainant here. Sergeant Parson's on-the-scene question about "how [Mr. Wills] got the keys" may not have been especially formal, but the complainant's response, that Mr. Wills "snatched" her keys from her, shares with *Hammon* and *Andrade* the critical characteristic that it deliberately reported—in response to a police officer's question—how a "potentially criminal past event[]" occurred.

The government contends that this court's decision in *Frye v. United States*, 86 A.3d 568 (D.C. 2014), establishes that the complainant's statement was not, in fact, testimonial. But as the Supreme Court has made clear, whether a statement is nontestimonial—that is, made in response to an ongoing emergency—is a "highly

context-dependent inquiry," *Bryant*, 562 U.S. at 363, and the context in which the complainant in *Frye* made her statements differs markedly from that in this case.[8] After receiving a call from a child about an assault involving the child's parents, the police in *Frye* arrived at the house to find five children downstairs and a man and a woman a foot apart at the top of the stairs shouting at each other as the woman backed away nervously and the man paced back and forth with his fist clenched up. 86 A.3d at 569. Though the police separated the pair, they were still close to each other when an officer asked the complainant what happened. The complainant was shaking and crying when she responded, had visible abrasions on her arms and neck, and appeared to need medical treatment. *Id*. at 570. Nearby, the man had his fists balled up and was speaking loudly to another officer. *Id*. The officer who spoke to the woman testified that at the time he had no information about how many people were involved in the assault, who the perpetrator was, or

---

[8] *Bryant* states that "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." 562 U.S. at 358. The government focuses on the ongoing-emergency ground, however, and we are unaware of any other ground on which the statements in this case could have been nontestimonial. *See, e.g.*, *United States v. Polidore*, 690 F.3d 705, 718 (5th Cir. 2012) (statements nontestimonial when made to "request police assistance in stopping an ongoing [drug trafficking] crime" even though no "ongoing emergency"); *cf. Frye*, 86 A.3d at 571 (noting that "the existence of [an ongoing] emergency 'is among the most important circumstances' to be considered in making that determination'") (quoting *Bryant*, 562 U.S. at 361, 370).

whether any weapons were involved. *Id.*

Most of the facts the court in *Frye* deemed critical to its determination that the complainant's statements to police were not testimonial are not present here—specifically, that the officers arrived to find a "heated dispute" still in progress, that the situation was "fluid and somewhat confused," *id*. at 571–72 (quoting *Bryant*, 562 U.S. at 377), that there were five children in the house who were possibly in danger or in need of "assistance from a social services agency," and that the complainant had visible injuries that required medical treatment, *id*. at 572–73. Although the court in *Frye* also relied upon the complainant's distraught condition, *Frye*, 86 A.3d at 572; *see also Davis*, 547 U.S. at 818, and here, Mr. Wills's wife was likewise crying and upset, the complainant's demeanor took on more significance in *Frye* where a still active quarrel required officers to "clarify what exigencies . . . existed requiring immediate action," and where officers had not "completely subdued" the suspect even by the time they led him out of the house, 86 A.3d at 572–73 (noting that the man "kicked luggage and other items on the way out"). In cases lacking such confusion, evidence that a complainant was distressed has not defeated a Confrontation Clause claim. In *Andrade*, for example, the complainant's visible distress was insufficient to render her statements nontestimonial when "a number of considerations point[ed] in the opposite direction." 106 A.3d at 389. Here, as in *Andrade*, "[t]he conclusion that

the questioning in *Frye* had the primary purpose of addressing an ongoing emergency thus does not support the same conclusion in the present case." *Id.* at 393; *see also Hammon*, 547 U.S. at 819, 832 (holding that the "somewhat frightened" complainant's on-the-scene statements were testimonial).

Considering the totality of the circumstances in this case, we are persuaded that Sergeant Parson did not ask his question about "how [Mr. Wills] got the keys" for the primary purpose of enabling police to deal with an ongoing emergency, and Mr. Wills has therefore satisfied the first prong of the plain error test by demonstrating that the complainant's statement in response to that question was testimonial for purposes of the Confrontation Clause.

## B. Plainness

We next address whether this error was plain. An error is plain when it is "clear or obvious, rather than subject to reasonable dispute" under current law. *In re Taylor*, 73 A.3d 85, 99 (D.C. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). We assess plainness in light of the state of the law at the time of appellate review, not the state of the law at the time of trial. *Muir v. District of Columbia*, 129 A.3d 265, 267 (D.C. 2016); *Taylor*, 73 A.3d at 99; *see also Henderson v. United States*, 133 S. Ct. 1121, 1129–30 (2013) ("[P]lain-error review is not a grading system for trial judges.").

The government makes no separate and specific argument in its brief about the plainness of the error, but there is no reasonable dispute that the Supreme Court's case law—most notably *Hammon*—compels the conclusion that the statement at issue here was testimonial. Where no emergency was in progress when the police arrived, the complainant was distraught but told police she was okay and showed no signs of injury, the suspect was not armed and was separated from the complainant when she made the statement, and the complainant's statement in response to police questioning described a past incident, it is "clear and obvious" that the oral statement the complainant made to the police about Mr. Wills "snatch[ing]" her keys was testimonial.

No subsequent cases in the Supreme Court or this court have complicated or cast doubt upon the *Hammon* Court's conclusion that the testimonial nature of statements provided in circumstances closely akin to those here is clear-cut. Though the government relies more on our decision in *Frye* than on the Supreme Court's fairly recent decision in *Michigan v. Bryant*, it is important to note, in assessing plainness, that nothing in the Supreme Court's decision in *Bryant*— which rejected Mr. Bryant's claim that the statements of a dying victim of a gunshot wound to a responding police officer were testimonial—purported to change or narrow the Court's holding in *Hammon*. The Court instead took pains to distinguish *Hammon* on the grounds that the case involved "a neutralized threat,"

"a known and identified perpetrator" who was unarmed and had not caused serious injury, and a domestic-violence situation, which often meant "a narrower zone of potential victims than cases involving threats to public safety." 562 U.S. at 363–64. In each respect, the same is true here.

Our own precedent reinforces *Hammon*'s continued bearing on domestic abuse cases where the police had separated the unarmed suspect from the complainant, there was no sign of injury, and the complainant responded to informal on-the-scene police questioning by describing aspects of an incident that had just occurred. *Andrade*, this court's most recent case addressing a *Crawford* ongoing-emergency question, confirmed the view that *Bryant* did not change the constitutional landscape in domestic abuse cases such as *Andrade* and the present case. *Andrade*, 106 A.3d at 392 (noting that *Bryant* "distinguished its earlier holding in *Hammon*" by "explaining that the statements deemed testimonial in *Hammon* arose in the context of a domestic-violence assault that involved neither a weapon nor serious injury") (citing *Bryant*, 562 U.S. at 364). And *Andrade*'s distinguishing of *Frye*, this court's other recent ongoing-emergency decision, makes clear that *Frye* did not signal a more expansive view of what constitutes an ongoing emergency after *Bryant*, and that its holding stemmed instead from its unique and "very different circumstances." *Id.* at 392–93. And while *Andrade* involved a suspect who had left the scene, *Andrade*'s own holding that a

complainant's statements to police were testimonial under circumstances that were otherwise very similar to this case independently supports Mr. Wills's argument that the error here was plain.[9] Factually similar cases in other jurisdictions further bolster that contention. *See, e.g., State v. Lucas*, 965 A.2d 75, 85–86 (Md. 2009) (holding that a domestic-violence complainant's responses to questions about "what happened" and "where she got the marks" were testimonial where the complainant was crying and upset and had red marks on her neck, but where the complainant was separated from the defendant during the questioning); *Zapata v. State*, 232 S.W.3d 254, 256–57, 260 (Tex. App. 2007) (same where the complainant was "crying and shaking" during questioning and had scratches on her neck and a large bruise on her arm, but where the complainant was separated from the defendant during questioning); *Commonwealth v. Galicia*, 857 N.E.2d 463, 467, 470 (Mass. 2006) (same where officers arrived to find the door to the complainant's apartment open, several chairs turned over, and the complainant visibly upset, with scratches on her face, but where the complainant was separated

---

[9] *Andrade* also provides an example of a case in which this court found a domestic-abuse complainant's statements to be testimonial in circumstances where the officer's questioning was unstructured and informal. This lends clear and very recent support to our conclusion that the fact that the complainant in *Hammon* formalized her initial oral statements in an affidavit carries little weight in this case, particularly as the oral statements' admission into evidence against Hershel Hammon independently violated the Confrontation Clause. 547 U.S. at 830–32.

from the defendant during questioning).

That the ongoing-emergency inquiry is "highly context-dependent" does not preclude a determination that the Confrontation Clause error here is beyond reasonable dispute, as "the 'plainness' of the error can depend on well-settled legal *principles* as much as well-settled legal *precedents*." *Conley v. United States*, 79 A.3d 270, 290 (D.C. 2013); *see also Arthur v. United States*, 986 A.2d 398, 412 (D.C. 2009) ("[T]rial judges are presumed to know and apply the legal principles enunciated in appellate decisions, and not simply to match factual scenarios, as few cases present the same facts."); *cf. Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (explaining, in the federal habeas corpus context, that a court's "misappli[cation] [of] a 'governing legal principle'" can be grounds for a finding that the court unreasonably applied clearly established law, even where the case involves "a set of facts different from those of the case in which the principle was announced") (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)). In this case, the principles and the precedents align. If it was "entirely clear" to the *Hammon* Court that Amy Hammon's statements were testimonial, *Hammon*, 547 U.S. at 829, it is also clear that the statement at issue here was testimonial. *Cf. id.* (calling it a "much easier task" to evaluate the testimonial character of Amy Hammon's statements "since they were not much different from the statements [the Court] found to be testimonial in *Crawford*").

### C. Substantial Rights

To establish that this error affected Mr. Wills's substantial rights, Mr. Wills must show "a reasonable probability that the Confrontation Clause violation had a prejudicial effect on the outcome of his trial." *Thomas v. United States*, 914 A.2d 1, 21–22 (D.C. 2006) (citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004)). Here, the complainant's statement "was the main, if indeed not the only, proof offered by the prosecution," *id*. at 22, to establish that Mr. Wills took the property of another with intent to deprive the other of the property, *see* D.C. Code § 22-3211 (b) (2012 Repl.). In finding that "the Government has proved beyond a reasonable doubt that [Mr. Wills] attempted to deprive [the complainant] permanently of the keys," the trial court relied only on Sergeant Parson's testimony "that as the woman came towards him, she looked back over her shoulder at the man and said, 'You need to get my keys, he took my keys'"[10] and on evidence that "the keys were later recovered by a different officer from somewhere on or near the defendant."

---

[10] "[H]e took my keys"—a paraphrase of the complainant's statement "[h]e snatched them from me"—constitutes direct evidence that Mr. Wills had wrongfully obtained the keys from the complainant. The complainant's other statements about her keys indicated only that Mr. Wills had them in his possession and that the complainant wanted the police to retrieve them.

The trial evidence included two other references to the complainant's keys not mentioned by the judge in her verdict. The anonymous 911 caller who witnessed the incident stated that the perpetrator threw a set of car keys "over onto the highway," and on cross-examination Ndya Silas disagreed with defense counsel's statement that she "didn't see keys get taken."[11] Such evidence is far from compelling. Assuming the person the anonymous caller mentioned was Mr. Wills, his statement does not say whose keys they were, how Mr. Wills came to possess them, or to what extent the keys' owner (if not Mr. Wills) was actually deprived of possession when keys landed in the street. Nor did Ms. Silas's testimony add much to this picture, as she did not suggest who took the keys from whom or how they were taken, and she admitted she did not know whose keys they were. Given the government's otherwise thin case on theft, we cannot conclude that the erroneous admission of the complainant's statement about Mr. Wills

---

[11] The prosecutor elicited no testimony about keys from Ms. Silas on direct examination. On cross-examination the colloquy went as follows:

Q: You didn't see a phone get thrown, did you?

A: No.

Q: You didn't see keys get taken, did you?

A: Yes.

Q: You don't know whose keys they were?

A: No.

"snatch[ing]" her keys was harmless. *In re Ty.B.*, 878 A.2d 1255, 1266 & n.18 (D.C. 2005) (citing *Fox v. United States*, 421 A.2d 9, 14 (D.C. 1980)). There is at least "a reasonable probability that the Confrontation Clause violation had a prejudicial effect on the outcome" of Mr. Wills's trial on the attempted theft charge, *Otts v. United States*, 952 A.2d 156, 161 (D.C. 2008), and therefore Mr. Wills's substantial rights were affected by the constitutional error. [12]

---

[12] We nevertheless reject Mr. Wills's challenge to the sufficiency of the evidence underlying the attempted theft conviction. When it includes the complainant's improperly admitted statement, the government's proof of attempted theft was constitutionally sufficient. *See Thomas v. United States*, 557 A.2d 599, 601 (D.C. 1989) (en banc) (citing *Lockhart v. Nelson*, 488 U.S. 33, 40–42 (1988)) (holding that a reviewing court addressing a challenge to the denial of a motion for judgment of acquittal considers the same erroneously admitted evidence that was considered by the trial court). Though admitted into evidence in violation of the Confrontation Clause, the evidence that the complainant told Sergeant Parson that Mr. Wills had "snatched" her keys, combined with the evidence that the complainant sought assistance in retrieving them, is sufficient to establish that Mr. Wills tried to wrongfully obtain another person's property of some value with the intent to deprive her of the right to or benefit of that property. *See* D.C. Code §§ 22-1803, -3211 (b)(1)–(2), -3212 (b) (2012 Repl.). Mr. Wills argues that the car and the keys were marital property, jointly owned by Mr. Wills and the complainant. But other than Sergeant Parson's testimony that "the complainant . . . identified Mr. [Wills] as her husband," there is no evidence in the record to support this argument. And according to Sergeant Parson's testimony, the complainant described the keys as "*my* keys" (emphasis added). Mr. Wills also argues that there is no evidence in the record that the keys had value. But a reasonable factfinder could infer that the keys had at least *some* value in light of their capacity to unlock and start the yellow Mustang. *See Jeffcoat v. United States*, 551 A.2d 1301, 1303 (D.C. 1988) ("[T]he value of an item is to be determined by its 'useful

(continued…)

With respect to Mr. Wills's conviction for assault, we conclude that the erroneous admission of the testimonial statement did not affect Mr. Wills's substantial rights. This is so even if we assume that the complainant's other statements, *see supra* note 5, were also testimonial and thus improperly admitted. The complainant's statements, as recounted by the officer, did not provide any evidence of an assault; the assault conviction was based on Ms. Silas's testimony and the anonymous 911 call. Mr. Wills argues that his wife's statement that he took her keys was the only evidence linking him to Ms. Silas's testimony, as Ms. Silas did not identify him as the perpetrator of the assault she witnessed. But the timing of Ms. Silas's 911 call, the officers' arrival at the scene, and Ms. Silas's departure from the scene is strong evidence that Mr. Wills and his wife were the two individuals involved in the incident Ms. Silas witnessed. The similarities between the descriptions given by Ms. Silas and the anonymous 911 caller also support a reasonable inference that Mr. Wills and his wife were the individuals involved in the assault witnessed by the anonymous caller. We conclude that as to the assault conviction, Mr. Wills has failed to satisfy the third prong of the plain error test. For the same reasons, we reject Mr. Wills's challenge to the sufficiency

---

(…continued)
functional purpose.'" (quoting *Jenkins v. United States*, 374 A.2d 581, 586 n.9 (D.C. 1977))).

of the evidence underlying his assault conviction.

## D. The Fairness, Integrity, or Public Reputation of the Trial

If the first three parts of the plain error test are satisfied, we "exercise [our] discretion to correct the error" when the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Thomas*, 914 A.2d at 22 (quoting *Johnson v. United States*, 520 U.S. 461, 470 (1997)). The government makes no fourth-prong argument in its brief.

In *Thomas v. United States* and *Otts v. United States*, this court held that a Confrontation Clause violation did not satisfy the fourth prong of the plain-error test when the trial court erroneously admitted a DEA chemist's report that a particular substance was cocaine and there was "no reason whatsoever to believe that the chemist's report was unreliable." *Thomas*, 914 A.2d at 22–24; *Otts*, 952 A.2d at 162–63. In contrast, this court has held that when a trial court bases its verdict entirely on officers' testimony regarding a complainant's out-of-court statements, a Confrontation Clause violation "would seriously affect the fairness and integrity of the proceedings." *Drayton v. United States*, 877 A.2d 145, 148–49 (D.C. 2005).

Although this is a case-by-case inquiry, *Thomas*, 914 A.2d at 23, the

principle in *Drayton* informs our analysis here. This is not a case like *Thomas*, in which the evidence of guilt was "essentially uncontroverted" and "overwhelming." 914 A.2d at 22 (quoting *Johnson v. United States*, 520 U.S. 461, 470 (1997)). Without the complainant's testimonial statement, the evidence of attempted theft was meager, if not legally insufficient, and to allow a conviction to stand in such circumstances "would seriously call into question the fairness and integrity of these proceedings." *United States v. Bruno*, 383 F.3d 65, 80–81 (2d Cir. 2004); *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004). The unfairness of leaving the Confrontation Clause violation without a remedy is more pronounced still where the government's proof that Mr. Wills committed the offense of attempted theft consisted almost entirely of unconfronted out-of-court statements—namely, the complainant's statements to Sergeant Parson and the anonymous 911 caller's reference to Mr. Wills throwing car keys.[13] "The perception that confrontation is essential to fairness has persisted over the centuries because there is much truth to it," and "the right to face-to-face confrontation . . . 'ensur[es] the integrity of the fact-finding process.'" *Coy v. Iowa*, 487 U.S. 1012, 1019–20 (1988) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 736 (1987)). We conclude that the erroneous

---

[13] Trial counsel unsuccessfully challenged the 911 call on Confrontation Clause grounds but Mr. Wills has not presented that claim on appeal.

admission of Mr. Wills's wife's statement seriously affected the fairness, integrity, and public reputation of the proceedings in this case.

## III.

Having determined that Mr. Wills has satisfied the requirements for plain error, we reverse his conviction for attempted theft and remand to the Superior Court for further proceedings.[14]  Mr. Wills's assault conviction is affirmed.

*So ordered.*[15]

---

[14]  At least as to the theft conviction, therefore, we need not consider Mr. Wills's alternative argument—not raised at trial—that the trial court erred by failing to make a missing witness inference adverse to the government.  As to the assault conviction, Mr. Wills cannot establish that any error in this regard would have affected his substantial rights where an adverse inference would not have undermined the main evidence of assault, which came from two neutral 911 callers who gave similar descriptions of the incident, not from any of the complainant's own statements.  *See Marquez v. United States*, 903 A.2d 815, 817 (D.C. 2006).

[15]  The government notes in its brief that certain docket entries and the judgment and commitment order in this case indicate that Mr. Wills was convicted of destruction of property rather than attempted theft. This clerical error should be corrected on remand.